UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| ROBERT N. HARRINGTON, JR. | ) | CASE NUMBER 05-40115 FDS |
| Plaintiff, | ) | |
| | ) | |
| VS. | ) | |
| | ) | |
| JAMES M KREIDLER, JR. AND | ) | |
| THE TOWN OF WINCHENDON, | ) | |
| Defendants. | ) | |

## JOINT PRE-TRIAL MEMORANDUM

Now come the Parties to this action and hereby submit this Joint Pre-Trial Memorandum:

1.    **STATEMENT OF THE CASE:**

    a.    **Plaintiff's Statement of the Case.**

Robert N. Harrington, Jr. (hereinafter referred to as "Harrington"), after being in the employ of the Town of Winchendon in various capacities for many years, became a full-time, non-reserve police office with the Town of Winchendon in 1995. On December 20, 1999, the Plaintiff Robert N. Harrington was appointed Chief of Police for the Town of Winchendon and entered into a three (3) year contract as Chief of Police.

Robert N. Harrington, Jr. is also a Master Sergeant in the Massachusetts Army National Guard. Robert N. Harrington, Jr. has been a member of the Massachusetts Army National Guard since 1981. During January 2001, Defendant James M. Kreidler, Jr. (hereinafter referred to as "Kreidler") was hired by the Town of Winchendon to act as Town Manager.

At the time that Kreidler became Town Manager, Harrington's personnel file contained no letters of reprimand, no suspensions and no records of other forms of discipline. Beginning in January 2001, Kreidler imposed upon Harrington numerous oral and written reprimands, suspensions, and other forms of adverse employment action in retaliation for the Plaintiff exercising his lawful rights.

Of particular importance are the following events. On June 4, 2001, the Defendant, James M. Kreidler, Jr. suspended the Plaintiff for five days relative to his handling of the January 2001 shooting investigation and his reporting of the investigation of the investigation to the press. Harrington expects the evidence to prove that this suspension was given partly in retaliation for Harrington going on Army National Guard duty the day after the shooting. On September 17, 2001, the Kreidler gave Harrington a so-called "letter of warning" for making a statement at a union grievance hearing regarding federal grant requirements. Harrington expects the evidence to prove that Kreidler gave him the written warning in an effort to prevent Harrington from exercising his right to free speech.

Beginning in January 2002, Kreidler began harassing Harrington incessantly. It was Kreidler's intention to harass Harrington until he resigned his position as Chief of Police for the Town of Winchendon. When Harrington did not resign his position, Kreidler continued with his harassment plan and began developing a pre-textual basis to terminate Harrington's employment, which he ultimate did on May 23, 2003. Kreidler engaged in this course of conduct in retaliation for Harrington going on active duty with the Massachusetts National Guard in January 2002, for using vacation time and accrued

2

benefit time, and for filing a complaint with the U.S. Department of Labor under

*USERRA*

During the morning of January 7, 2002, the Harrington notified Kriedler that he likely would be going on duty with the Army National Guard and that he would be using his accumulated vacation time while on duty with the Army National Guard. After Harrington informed Kreidler that he would be going on duty with the Army National Guard, Kreidler began to question Harrington about the validity of his orders and about the fact that the Harrington intended to use accrued benefit time while his was on active duty. Kreidler informed the Harrington that although his contract provided that Harrington was entitled to compensatory time, he expected Harrington to work overtime without taking compensatory time. Kreidler's actions in this regard were in retaliation for Harrington using his accrued vacation time to go on Army National Guard duty.

On January 10, 2002, the Defendant Town Manager issued the Plaintiff a written reprimand purportedly for making false statements about Kreidler. This reprimand was given in an effort to prevent Harrington from exercising his right to free speech and was in retaliation for Harrington going on reserve duty with the Army National Guard and for using his vacation time while on guard duty.

Harrington contacted the Veterans' Employment and Training Service to determine what his rights and obligations were regarding his going on active duty with the Army National Guard. Harrington notified Kreidler that he was entitled to use his accumulated benefited time for active duty. Despite this fact, Kreidler continued to harass Harrington regarding the fact that he was going on active duty and the fact Harrington was using his accumulated benefit time.

On or about January 22, 2002, Kreidler gave Harrington a written record of a written warning purportedly on the grounds that Harrington failed to handle a grievance. Harrington expects the evidence to show that the stated reason for the warning was pre-textual and that the warning was given in retaliation for the fact that Harrington was going on reserve duty. On or about January 23, 2002, Defendant Kreidler once again began to harass the Plaintiff regarding his Army National Guard duty and told the Plaintiff that he should not use his vacation time for Army National Guard duty. On the same day Kreidler issued Harrington a written reprimand purportedly on the grounds that Harrington improperly charged an expense item to the wrong line item. Harrington expects the evidence to show that the stated reason for the written reprimand was pre-textual and that the warning was given in retaliation for the fact that Harrington was going on reserve duty and had contacted the Department of Labor. On or about January 23, 2002, Kreidler issued Harrington another written reprimand purportedly on the grounds that Harrington mischaracterized a discussion they had regarding Harrington's military leave. Harrington expects the evidence to show that the stated reason for the written reprimand was pre-textual and that the reprimand was given in retaliation for the fact that Harrington was going on reserve duty and was using his vacation time. On January 24, 2002, Kreidler issued Harrington a one day suspension letter purportedly for making a budget error. Once again, Harrington expects the evidence to show that the stated reason for the one day suspension was pre-textual and that the reprimand was given in retaliation for the fact that Harrington was going on reserve duty and was using his vacation time and had called the Department of Labor.

4

On March 4, 2002, the Harrington returned from Army National Guard duty and reported to work. Immediately upon his return, Kreidler once again began harassing the Harrington about taking time off for Army National Guard duty. On March 6, 2002, the Plaintiff filed a complaint with the United States Department of Labor, Veteran's Employment and Training Service. On March 11, 2002, Kreidler gave Harrington a five day suspension letter for various reasons surrounding Harrington's Army National Guard duty during the months of January and February 2002. Following the March 11, 2002 five day suspension letter, Kreidler engaged in a pattern of behavior intended to harass, intimidate, embarrass and torment Harrington, including but not limited to: denigrating the Harrington in public meetings; making defamatory statements regarding Harrington's job performance to the Town of Winchendon Board of Selectmen and various news papers; restricting the Harrington's management responsibilities; undermining the Harrington's authority with his staff; requiring the Harrington to work patrol shifts, limiting Harrington's use of his police vehicle, preventing Harrington from attending meetings with other local chiefs of police; repeatedly threatening to suspend and/or terminate Harrington's employment with the Town of Winchendon; disclosing Harrington's personnel file to third parties; pressuring the Plaintiff to work overtime without receiving compensation time; by initiating police investigations into his family members; by calling the Army National Guard to inquire about Harrington's orders; by refusing to extend Harrington's contract; by limiting Harrington's budget; by refusing to grant Harrington his duly earned comp time; by repeatedly requiring Harrington to provide written explanations of everything Harrington did or said; by demanding written apologies from Harrington; by repeatedly accusing Harrington of wrongdoing; by

harassing Harrington whenever he went for Army National Guard meetings or training; and by intentionally creating a hostile work environment for Harrington.

On July 19, 2002, Harrington was placed on administrative leave by Kreidler. Harrington's employment with the Town of Winchendon was subsequently terminated on May 27, 2003. Harrington was placed on administrative leave and ultimately terminated by the Town of Winchendon in retaliation for Harrington doing to reserve duty with the Army National Guard in January 2001 and for going on active duty with the Massachusetts National Guard in January 2002 and using vacation time while, and for filing a complaint with the U.S. Department of Labor under *USERRA,* and for going on reserve duty in June 2002.

Harrington also expects the evidence to establish that Kreidler's harassment of and the termination of his employment were was also in retaliation for Harrington exercising right to free speech and in retaliation for Harrington taking other lawful actions. For instance, during a meeting with the police union and Kreidler, Harrington objected to James Kreidler using a federally funded officer for purposes in violation of the federal grant. Harrington was given a letter of reprimand for this incident. Harrington was also reprimanded for sending a letter to the Board of Selectmen. Harrington expects the evidence to show that Kreidler harassed him in part for refusing to provide Kreidler with CORI information; for refusing to fix a parking ticket for a selectman; for speaking to the press about a parking ticket; for speaking up about a community policing survey, for contacting the state retirement board regarding a former Winchendon employee; by refusing to attend a press conference for a town selectman following the selectman's arrest on gun charges.

As a result of Kreidler's actions, Harrington has suffered economic damages and
endured significant mental anguish.  Harrington expects the evidence to establish the
following special damages:

**Lost Pay From Employment as Chief of Police:**

May 27, 2003 to December 31, 2007:
4.6 years at $82,500.00 per year-                     $379,500.00

(Harrington's contract, which expired
December 2002, paid him approximately
$70,500 per year.  Harrington expects the
evidence to show that if he was not
retaliated against and given a second contract,
the pay would have likely been $82,500.00
per year.)

**Other Lost Income:**

Teaching Assignments at Criminal Justice
Academy and Mt. Watchusett Community
College.

Approx. $5,000 per year x 4.6 years.                  $23,000.00

Weekend National Guard Pay:

Approx. $8,000.00 per year x 4.6 years.               $36,800.00

**TOTAL LOST SALARY:**                                **$439,300.00**

**LOST VACATON PAY:**                                 **$11,766.27**

**LOST HOLIDAY PAY:**                                 **$7,560.96**

**LOST SICK TIME:**                                   **$10,881.28**

Approximately two months after his termination by the Town of Winchendon,
Harrington went to work full time with the Massachusetts Army National Guard,
including a deployment to Irag.

7

**INCOME EARNED SINCE DISCHARGE:**      **$222,603.78**
(This amount does not include any monies
received for daily living allowance from
the military.)

In addition to the above pay, Harrington has lost 4.6 years of contribution to the

Worcester County Pension Fund, which Harrington seeks to have established as part of

the relief sought in this case.  Harrington seeks reemployment as Chief of Police.

Additionally, Harrington seeks double damages under 38 U.S.C. §4323, attorney's fees

and costs.

      **b.**    **Defendant's Statement of the Case.**

The plaintiff was employed by the Town of Winchendon as Chief of Police.  His

direct supervisor was defendant Town Manager James Kreidler.  In July 2002, the

plaintiff was placed on administrative leave pending an investigation into allegations of

misconduct.  In May 2003 he was terminated. The evidence will show that the decision to

terminate the plaintiff was proper and justified; and that his discipline and discharge was

wholly unrelated to his service in the National Guard or his legitimate exercise of any

other right.

The evidence will show that the plaintiff was disciplined and ultimately

discharged from employment for a series of acts of misconduct in the Spring of 2002.

Prior to these acts, the plaintiff had been repeatedly and progressively disciplined for

other misconduct, and for incompetence and lack of integrity.

Specifically, the plaintiff engaged in the following acts of misconduct in the

weeks prior to being placed on leave:

On May 17, 2002, the plaintiff lied to Town Manager James Kreidler.  He

informed Kreidler in writing that two members of the Board of Selectmen had told the

8

marshal of the annual Memorial Day parade, an elderly veteran of World War II, that the Town would not provide a police cruiser for the parade due to a shortage of funds. This was untrue. The selectmen did not make the statement to the parade marshal, and the marshal did not inform the plaintiff of any such thing. Next, in furtherance of the lie, the plaintiff attributed another statement to a local business owner which was false and which the business owner did not make. These false statements were malicious and an assault on the integrity of the selectmen.

After Winchendon's police and fire dispatchers, who worked under his command, made a public vote of no confidence in the plaintiff on May 8, 2002, the plaintiff issued a flurry of reprimands against individual dispatchers in retaliation. These reprimands were for matters for which discipline had not previously been imposed, and were not imposed consistently.

In June 2002, the plaintiff allowed an "immediate threat" notice to be filed with the Registry of Motor Vehicles, which resulted in the immediate suspension of a dispatcher's driver's license, and Registry proceedings to revoke that license. The immediate threat action was not warranted and was rejected by the Registry. The dispatcher was the vice president of the union that had voted no confidence in the plaintiff. This was another improper act of retaliation.

After the dispatcher's union voted no confidence in the plaintiff, he refused to provide them with requested training, and transferred all training funds from their budget to another account, which was unwarranted because the funds were never spent. This was yet another improper act of retaliation.

9

On several occasions after the vote of no confidence, the plaintiff lost his temper with individual dispatchers. These instances included shouting and acts of physical intimidation in which the plaintiff made a spectacle of himself and put the targets of his rage in fear.

In July 2002, the plaintiff gave a statement to the press concerning a pending criminal case. In that case, the plaintiff's brother, who was also a Winchendon police officer, had been charged with rape by the Worcester County District Attorney's Office. The complaining witness in the case was a dispatcher under the plaintiff's supervision. While criminal court proceedings were ongoing, the plaintiff declared to the press his support for his brother and expressed confidence that his brother would prevail. This was an egregious act of misconduct.

The foregoing list is not exhaustive, nor does it specify the rules, policies or agreements that the plaintiff violated, all of which will be introduced at trial.

Previous to engaging in the above-listed misconduct, the plaintiff had been warned, reprimanded and suspended on a number of occasions. The first disciplinary action was a five-day suspension in June 2001. The discipline arose from the plaintiff's handling of a fatal shooting incident in which a Winchendon officer killed a citizen. This was a major incident which could have led to criminal charges against the officer. Immediately after the shooting, the plaintiff issued a press release which featured significant inaccuracies. The plaintiff either knew or should have known of the inaccuracies when the press release was issued. Then, within a minimum of two days, the plaintiff was provided with clear evidence that the press release was indeed inaccurate, but he neither took action to correct it, nor informed the Town Manager of the

problem. For approximately six months the plaintiff failed to inform the Town Manager of the inaccuracy. Ultimately the Town Manager learned of the true facts pertaining to the incident from a newspaper reporter. In addition, the plaintiff returned the officer involved to regular duty before the investigation had concluded, in violation of clear departmental regulations. All of these acts and omissions raised serious questions about the plaintiff's competence and ability to retain the public confidence.

After a series of subsequent reprimands for acts of untruthfulness and incompetence, the next major disciplinary incident took place in January 2002. In that instance, the plaintiff made a significant budgetary error. He failed to discover the error and notify the Town Manager despite receiving several months of reports indicating the problem. When he realized the mistake, he first attempted to deflect blame upon his part-time secretary. This demonstrated a lack of competence with respect to a fundamental aspect of his position, and a lack of leadership and responsibility. He was suspended for one day for this incident.

Later in January 2002, the plaintiff engaged in misconduct which led to a four-day suspension. In the previous month, the plaintiff's secretary had filed a union grievance against the plaintiff, which in general terms complained of his lying, fomenting discord among her co-workers and failure to provide management leadership. She also expressed concern that the complaint would result in retaliation against her. The Town Manager first asked, and when his request was ignored, issued a written order to the plaintiff to meet with his secretary and address each one of her concerns. The plaintiff later reported that he had met with the secretary and addressed each aspect of her complaint when in fact, he had not.

At roughly the same time, the plaintiff informed the Town Manager that he would be joining his National Guard unit at the Salt Lake City Winter Olympics for a security assignment. The Town Manager asked the plaintiff whether this was a voluntary or mandatory assignment, and the plaintiff untruthfully stated that it was mandatory. The Town Manager also asked the plaintiff to provide a manner of contacting him in case of an emergency. The plaintiff failed to provide that information before his departure, and on his return falsely stated that there was no way to communicate with him during his absence.

The Town Manager initially decided to impose a five-day suspension for the acts of misconduct involving the plaintiff's secretary and his lies concerning his departure for the Winter Olympics. However, the plaintiff contacted the U.S. Department of Labor's Office of Veterans' Employment and Training to complain ("Dept. of Labor"). The Town Manager then consulted with the Dept. of Labor and was informed that despite the plaintiff's untruthfulness, he could not legally be disciplined because the matters he lied about were associated with his National Guard service. In cooperation with the Dept. of Labor, and with its approval, the Town Manager pro-rated the five-day suspension to four days, and explicitly based it solely on the plaintiff's misconduct concerning his secretary.

All of the foregoing incidents in the spring of 2002 took place in the midst of a significant budgetary problem involving the police department. During that time, it was discovered that the police overtime budget had been overspent in an amount that neared or exceeded the Town's entire emergency fund. Public hearings of the Finance Commission were held in which the plaintiff attempted to explain the problem and propose measures to address it. The Town's Finance Commission granted the plaintiff a

portion of the needed monies and gave him one month to impose cost controls that would address the problem. The plaintiff was unable to effect sufficient control in that period. As a result, the Town Manager was forced to take control of police overtime. He imposed cost controls, which included requiring the plaintiff to work cruiser shifts. The plaintiff deemed this harassment.

The defendants expect to present detailed evidence convincingly demonstrating all of these issues at trial. Moreover, there are a number of additional incidents and issues too numerous and involved to present within this concise statement, but all of which will tend to further demonstrate the plaintiff's inability to perform as a Chief of Police.

Various aspects of the discipline imposed against the plaintiff were vetted or supported by entities other than the Town Manager. Two of the suspensions were subject to a hearing presided over by an outside contractor. The termination was preceded by an investigation conducted by another outside contractor. As stated above, the Dept. of Labor approved the pro-rating of the plaintiff's suspension which initially concerned his untruthfulness and failure to communicate regarding his National Guard duty. Moreover, the police union voted no confidence in the plaintiff, just as the dispatchers had.

The defendants expect the evidence will prove that the plaintiff consistently demonstrated his inability to competently perform his core duties and failed to keep himself and the Town Manager informed of important issues. Moreover, he frequently made deceptive and false statements to his supervisor, to his subordinates and to the public. These acts of misconduct were the sole reasons for his discipline and discharge; his National Guard service had no bearing on the handling of his case.

13

2.    **STATEMENT FACTS ESTABLISH BE PLEADINGS.**

None, other than the identity of the parties.

3.    **CONTESTED ISSUES OF FACT.**

a.      Did Kreidler and the Town of Winchendon violate 38 U.S.C. §4311 by discriminating against, harassing, punishing, suspending and ultimately terminating Harrington's employment as a result of Harrington performing his duties with the Army National Guard as well as applying to perform his duties with the Army National Guard?

b.      Did Kreidler and the Town of Winchendon violate 38 U.S.C. §4311 by discriminating against, harassing, punishing, suspending and ultimately terminating Harrington's employment because Harrington had taken actions to enforce his rights under 38 U.S.C. § 4301 et seq. and had made statements in connection with proceedings under 38 U.S.C. § 4301 et seq. and had exercised his rights under 38 U.S.C. § 4301 et seq.

c.      Did Kreidler, by threats, intimidation and/or coercion, interfere with the Harrington's exercise or enjoyment of rights secured to him by the constitutions and the laws of the Commonwealth of Massachusetts, and the Constitution and laws of the United States, including but not limited to the Harrington's right to free speech, Harrington's rights under 38 U.S.C. § 4301 et seq. and the Harrington's employment?

d.      Did Kreidler, under color of state law, deprive Harrington of the exercise or enjoyment of rights secured to him by the Constitution of the United States and the laws of the United States of America including but not limited to Harrington's

14

right to free speech, the Plaintiff's rights under 38 U.S.C. § 4301 et seq. and Harrington's employment.

e.      Did Kreidler wrongfully invade Harrington's right to privacy by disclosing his personnel file to individuals not entitled to review the personnel file and by continually disclosing information to the newspapers in the Winchendon area that unreasonably placed Harrington in a false light before the public.

f.      Did Kreidler engage in outrageous and extreme conduct with the intention of causing Harrington to suffer severe emotional distress?

g.      Was Kreidler acting within the scope of his employment with the Town of Winchendon when he committed any of the above referenced acts?

h.      What, if any, damages did Harrington suffer?

**4.      JURISDICTIONAL ISSUES.**

There are no jurisdictional issues in this case.  The Parties agree that the Court has jurisdiction over this matter and that venue is proper.

**5.      QUESTIONS RAISED BY PENDING MOTIONS.**

Currently there are no pending motions before the Court.

**6.      ISSUES OF LAW.**

The Parties are unaware of any unusual issues of law.

The plaintiff filed an appeal of two of his suspensions and termination with the Civil Service Commission.  A full evidentiary hearing was conducted and the Commission issued a decision.  The decision found that despite his misconduct, the plaintiff should not have been terminated, and it ordered that he be reinstated at the rank

of patrol officer.  The ruling has been appealed by the Town.  The defendants assert that because the matter is on appeal, it has no preclusive effect.

The Town removed all references to the plaintiff's National Guard service with respect to the pro-rated four-day suspension.  The effect of the Department of Labor's approval of the action must be decided by this Court.

**7.     REQUESTED AMENDMENTS TO THE PLEADINGS.**

There aren't any requested amendments to the pleadings at this time.

**8.     MATTERS TO AID IN THE DISPOSITION OF THE ACTION.**

None.

**9.     LENGTH OF TRIAL.**

It is estimated that this case will require at least 10 half-days of trial or 6 to 8 full days of trial.

**10.     WITNESS LISTS.**

**The Parties hereby submit the following witness lists.  The Parties request that the Court set a final deadline to supplement witness lists forty-five (45) days prior to trial.**

**a.     Plaintiff's Witness List.**

1.     Allen Lafrennie
       51 Baldwinville State Rd
       Winchendon, MA 01475-1827

2.     Burton Gould., Jr.
       126 West St
       Winchendon, MA 01475-1141

3.     Germaine Brooks
       157 School St
       Winchendon, MA 01475-1135

4.      Richard A. McAllister
        150 Murdock Ave
        Winchendon, MA 01475-1125

5.      Keith & Tracey Barrows
        830 Central St
        Winchendon, MA 01475-1200

6.      Stephen C. Ashmore
        41 Webster St
        Winchendon, MA 01475-1435

7.      Terri Flint
        197 School St
        Winchendon, MA 01475-1152

8.      Melissa Leray Martin
        23 Otter River Rd
        Winchendon, MA 01475-2084
9.      Amy Belanger
        20 Banner Pl
        Winchendon, MA 01475-1174

10.     Corey Bohan
        24 Sibley Rd.
        Winchendon, MA 01475

11.     Erica Lafrennie
        51 Baldwinville State Road
        Winchendon, MA 01475

12.     James M. Kreidler, Jr.
        Town Manager
        Town of Winchendon
        109 Front Street
        Winchendon, MA

13.     Wayne Gelinas
        Royalston Police Department
        Royalston MA,

14.     Ralph Harrington
        Police Officer
        Town of Winchendon;
        109 Front Street

Winchendon, MA

15.    Alida Herring
       Town of Winchendon Employee;
       109 Front Street
       Winchendon, MA

16.    David Connors
       Winchendon Housing Department
       109 Front Street
       Winchendon, MA

17.    Yma Offeral
       Address Unknown;

18.    Lois Abare
       Winchendon Town Clerk
       109 Front Street
       Winchendon, MA

19.    David Walsh
       Police Detective
       Town of Winchendon
       109 Front Street
       Winchendon, MA

20.    Raymond Anair
       Police Officer
       Town of Winchendon;

21.    James Spofford
       Police Officer
       Town of Winchendon;

22.    William Geoffrey
       Police Officer
       Town of Winchendon
       109 Front Street
       Winchendon, MA

23.    Richard Chase
       Former Winchendon Employee
       Address Unknown

24.    Paul Desmond,

U.S. Department of Labor
19 Staniford Street
Boston, MA

15.     George J. Kincannon,
        U.S. Department of Labor
        19 Staniford Street
        Boston, MA

16.     Major Jeffrey Loughlin,
        Army National Guard,
        24 Ridgewood Road
        Easton, MA

17.     Colonel Gordon Bennett (Ret.),
        Army National Guard,
        50 Maple Street
        Milford, MA

18.     Major Jeffrey Loughlin
        Army National Guard
        1211 Pleasent Sreet
        Brockton MA 02301

19.     Colonel Greg Smith
        10 Holden Street
        Ashburnham, MA 01430

20.     Sgt. First Class, John Caplis,
        Army National Guard
         50 Maple Street
        Milford, MA

21.     Gordon J Jr Bennett
        54 Lawrence Rd
        Derry, NH 03038-4191

22.     Lieutenant Colonol Charles Cody
        Army National Guard
        50 Maple Street
        Milford, MA 01757

23.     Liz Gilman
        Town Accountant
        Town of Winchendon
        109 Front Street

Winchendon, MA

24. Barbara LaFrennie
    Assistant Accountant
    Town of Winchendon
    109 Front Street
    Winchendon, MA

25. Linda Beaven
    Assessors Office
    Town of Winchendon;
    109 Front Street
    Winchendon, MA

26. Fred Cloutier
    Retired Winchendon Police Officer
    Spring Street
    Winchendon, MA

27. Lorenzo J. Sordoni
    26 Lakeview Drive
    Winchendon, MA

28. Richard Bedard
    Winchendon Public Schools
    109 Front Street
    Winchendon, MA

29. Robert O'Meara
    Winchendon Public Schools
    109 Front Street
    Winchendon, MA

30. Sue Szink
    Winchendon Public Schools
    109 Front Street
    Winchendon, MA

31. Richard Chase
    Address Unknown

32. Jason Miglionico
    Auburn Police Department
    104 Central Street
    Auburn, MA

33. George Barnes
Worcester Telegram & Gazette

34. Petulah Olibert
The Gardner News
309 Central Street
Gardner, MA 01441-03

35. Doneen Durling
Winchendon Courier
91 Central Street
Winchendon, MA 01475

36. Ruth Deamicis
Winchendon Courier
91 Central Street
Winchendon, MA 01475

37. Kristen Spofford
Winchendon Courier
91 Central Street
Winchendon, MA 01475

38. Angela Chararubini
Winchendon Courier
91 Central Street
Winchendon, MA 01475

39. Molly Crane
Gardner News
309 Central Street
Gardner, MA 01441-03

40. Doneen Durling
Winchendon Courier
91 Central Street
Winchendon, MA 01475

41. Ed Bilodeau
Gardner News
309 Central Street
Gardner, MA 01441-03

42. Caroline Salls
Gardner News

309 Central Street
Gardner, MA 01441-03

43.    Shawn Ilinitch
       Gardner News
       309 Central Street
       Gardner, MA 01441-03

The Plaintiff reserves the right to call any witnesses listed on the Defendant's

witness list.

**b.    Defendant's Witness List.**

In addition to any witness listed by the plaintiff, the

defendants may call the following witnesses:

1.    Robert N. Harrington Jr., plaintiff, 200 Hall Road, Winchendon, Massachusetts;

2.    James M. Kreidler, Jr., defendant, Town Manager, Town of Winchendon, 109 Front Street, Winchendon, Massachusetts;

3.    Burton E. Gould,  Board of Selectmen, Town of Winchendon, 109 Front Street, Winchendon, Massachusetts;

4.    Cynthia A. Boucher, former member, Board of Selectmen, Town of Winchendon, 109 Front Street, Winchendon, Massachusetts;

5.    Lorenzo J. Sordoni,  former member, Board of Selectmen, Town of Winchendon, 109 Front Street, Winchendon, Massachusetts;

6.    Keith R. Barrows,  Board of Selectmen, Town of Winchendon, 109 Front Street, Winchendon, Massachusetts;

7.    Mary A. Delaney,  Board of Selectmen, Town of Winchendon, 109 Front Street, Winchendon, Massachusetts;

8.    Donald Duplease,  Board of Selectmen, Town of Winchendon, 109 Front Street, Winchendon, Massachusetts;

9.    David LaPointe,  Board of Selectmen, Town of Winchendon, 109 Front Street, Winchendon, Massachusetts;

10.    Richard Burke,  Board of Selectmen, Town of Winchendon, 109 Front Street, Winchendon, Massachusetts;

11.    Rick McAllister,  former member, Board of Selectmen, Town of Winchendon, 109 Front Street, Winchendon, Massachusetts;

12.    Sergeant Ralph Harrington,  Winchendon Police Department, 15 Pleasant Street, Winchendon, Massachusetts;

13.    Laurence Melen,  former Town Manager, Town of Winchendon, 109 Front Street, Winchendon, Massachusetts;

14.    Karen M. Murphy,  former Acting Town Manager, Town of Winchendon, 109 Front Street, Winchendon, Massachusetts;

15.    Former Police Chief Steven D. Thompson,  Winchendon Police Department, 15 Pleasant Street, Winchendon, Massachusetts;

16.    Sergeant Marcel P. Rougier,  Winchendon Police Department, 15 Pleasant Street, Winchendon, Massachusetts;

17.    Former Chief Frederick Cloutier,  Winchendon Police Department, 15 Pleasant Street, Winchendon, Massachusetts;

18.    Patrolman Michael E. Young,  Winchendon Police Department, 15 Pleasant Street, Winchendon, Massachusetts;

19.    Patrolman Richard Marinelli,  Winchendon Police Department, 15 Pleasant Street, Winchendon, Massachusetts;

20.    Patrolman James P. Spofford,  Winchendon Police Department, 15 Pleasant Street, Winchendon, Massachusetts;

21.    Sergeant William P. Geoffroy,  Winchendon Police Department, 15 Pleasant Street, Winchendon, Massachusetts;

22.    Detective David P. Walsh,  Winchendon Police Department, 15 Pleasant Street, Winchendon, Massachusetts;

23.    Patrolman Gerald J. Gagne,  Winchendon Police Department, 15 Pleasant Street, Winchendon, Massachusetts;

24.    Patrolman Raymond M. Anair,  Winchendon Police Department, 15 Pleasant Street, Winchendon, Massachusetts;

25.    Patrolman Kevin E. Wolski,  Winchendon Police Department, 15 Pleasant Street, Winchendon, Massachusetts;

26.    Jason P. Miglionico,  former Patrolman, Winchendon Police Department, 15 Pleasant Street, Winchendon, Massachusetts;

27.    Patrolman Derek Blair,  Winchendon Police Department, 15 Pleasant Street, Winchendon, Massachusetts;

28.    Patrolman Ralph Hamilton,  Winchendon Police Department, 15 Pleasant Street, Winchendon, Massachusetts;

29.    Patrolman Kevin Wolski,  Winchendon Police Department, 15 Pleasant Street, Winchendon, Massachusetts;

30.    Dispatcher Melissa (LeRay) Martin,  formerly of the Winchendon Police Department, 15 Pleasant Street, Winchendon, Massachusetts;

31.    Dispatcher Teresa Flint,  Winchendon Police Department, 15 Pleasant Street, Winchendon, Massachusetts;

32.    Dispatcher Erika Lafrennie,  Winchendon Police Department, 15 Pleasant Street, Winchendon, Massachusetts;

33.    Corey Bohan,  24 Sibley Road, Winchendon, Massachusetts;

34.    Dispatcher Wayne Gelinas,  Winchendon Police Department, 15 Pleasant Street, Winchendon, Massachusetts;

35.    Former Dispatcher Steven Ashmore,  Winchendon Police Department, 15 Pleasant Street, Winchendon, Massachusetts;

36.    Amy Belanger,  Winchendon Police Department, 15 Pleasant Street, Winchendon, Massachusetts;

37.    Debbie Sousa,  Winchendon Police Department, 15 Pleasant Street, Winchendon, Massachusetts;

38.    Yma Offerall,  present address unknown;

39.    Tracy Flagg,  Winchendon Police Department, 15 Pleasant Street, Winchendon, Massachusetts;

40.    Michael Ladeau,  Winchendon Police Department, 15 Pleasant Street, Winchendon;

41.   Richard Oinonen, Jr.,  Winchendon Police Department, 15 Pleasant Street, Winchendon, Massachusetts;

42.   Andrew St. Peter,  Winchendon Police Department, 15 Pleasant Street, Winchendon, Massachusetts

43.   Eric Joel Vezina,  Winchendon Police Department, 15 Pleasant Street, Winchendon, Massachusetts;

44.   James Robichaud,  Winchendon Police Department, 15 Pleasant Street, Winchendon, Massachusetts;

45.   Michael J. McRae,  Winchendon Police Department, 15 Pleasant Street, Winchendon, Massachusetts;

46.   Unnamed members of the Winchendon Police Department, 15 Pleasant Street, Winchendon, Massachusetts;

47.   Detective Sergeant O'Keefe,  Massachusetts State Police, Detective Unit, 19 Midstate Drive, Auburn, Massachusetts;

48.   Lieutenant Frank Moore,  Massachusetts State Police, Detective Unit, 19 Midstate Drive, Auburn, Massachusetts;

49.   Trooper Leonard Sancoucy,  Massachusetts State Police, Computer Forensic Lab, General Headquarters, 470 Worcester Road, Framingham, Massachusetts;

50.   Trooper Brian Lee,  Massachusetts State Police, Computer Forensic Lab, General Headquarters, 470 Worcester Road, Framingham, Massachusetts;

51.   Major Stephen C. Leary,  Massachusetts State Police, Troop C Headquarters, 612 Main Street, Route 122A Holden, Massachusetts;

52.   Joan Bousquet,  unknown address, Winchendon, Massachusetts;

53.   Linda Bevan,  Union Steward, Winchendon Police Department, 15 Pleasant Street, Winchendon, Massachusetts;

54.   Aidyth Bilodeau,  unknown address, Winchendon, Massachusetts;

55.   Donna Spellman,  unknown address, Winchendon, Massachusetts;

56.   Patty Driscoll,  unknown address, Winchendon, Massachusetts;

57.   Ray Selling,  unknown address, Winchendon, Massachusetts;

58.    Marc W. Chavanne,  Director, Test Administration, Commonwealth of
Massachusetts, Executive Office for Administration and Finance, Human
Resources Division, One Ashburton Place, Boston, Massachusetts;

59.    Maureen Murphy,  Commonwealth of Massachusetts, Executive Office for
Administration and Finance, Human Resources Division, One Ashburton
Place, Boston, Massachusetts;

60.    Patrick Doyle,  87 Central Street, Winchendon, Massachusetts;

61.    Captain James E. Hamel,  Assistant Director of Public Safety, Fitchburg
State College, 160 Pearl Street, Fitchburg, Massachusetts;

62.    David W. Sandmann,  Superintendent of Schools, Winchendon Public
Schools, 175 Grove Street, Winchendon, Massachusetts;

63.    Mark Kauppinen,  P.O. Box. 643, East Templeton, Massachusetts;

64.    Richard Hoyt,  1 Cummings Road, Winchendon, Massachusetts;

65.    F. Richard Ladeau,  Snow-Ladeau Funeral Home, Inc., 343 Central Street,
Winchendon, Massachusetts;

66.    Tony Kurylo,  Central IGA Supermarket, 49 Central Street, Winchendon,
Massachusetts.  ;

67.    Dana Kurylo,  Central IGA Supermarket, 49 Central Street, Winchendon,
Massachusetts;

68.    Kevin M. Donnelly,  Academy Director, Commonwealth of Massachusetts
Criminal Justice Training Council, 411 Waverly Oaks Road, Suite 325,
Waltham, Massachusetts;

69.    Ernest P. Fletcher,  15 Oak Street, Winchendon, Massachusetts;

## 11.    EXHIBIT LISTS.

During the discovery process in this case, there were approximately 5,000 pages
of documents exchanged by the Parties.  Pursuant to the pre-trial order the parties have
attempt to prepare a comprehensive exhibit lists setting forth agreed and contested
exhibits.  Despite good faith efforts by the Parties, they have been unable to complete this

26

task as of this date. The Parties request that the Court set a further deadline for the parties to file a final exhibit lists thirty days (30) prior to the trial in this action. The Parties further request that the Court set a deadline to exchange written objections to the contested exhibits fourteen (14) days prior to the trial in this action.

Respectfully Submitted,

The plaintiff,                          The defendants,
By his attorney,                        By their attorneys,


/s/ L. Richard LeClair, III_____     /s/ Thomas P. Campbell_____
L. Richard LeClair, III, BBO#561650     Thomas P. Campbell, BBO#564124
LeClair & LeClair, P.C.                 Brody, Hardoon, Perkins & Kesten, LLP
707 Main Street                         One Exeter Plaza
Waltham, MA  02451                      Boston, MA 02116
781-893-5655                            617-880-7100



Date:   February 26, 2008